PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. This Court has mandatory jurisdiction. See art. V, § 3(b)(1), Fla. Const. The defendant raises issues related only to the penalty phase: specifically, the trial court’s findings of multiple aggravating factors and the trial court’s failure to find uncon-troverted statutory mitigation. Williams is unquestionably guilty of first-degree murder and does not challenge his conviction.[1] As to the imposition of the death sentence, we conclude that this crime is not one of the most aggravated and least mitigated of murders to qualify for the ultimate penalty — death. Rather than a carefully planned murder, the evidence demonstrates that this murder occurred after an argument erupted with the victim, with whom Williams lived. For the reasons fully explained in this opinion, we vacate the death sentence and remand the case for the imposition of a sentence of life imprisonment without the possibility of parole.
FACTS AND PROCEDURAL HISTORY

The Guilt Phase

Kirk Douglas Williams, who was twenty-eight years old at the time of the crime, was convicted of one count of first-degree murder for the murder of Susan Littrell Dykes. Williams had been living with Dykes for a period of time prior to her *191 murder. The murder occurred some time between the late afternoon hours of Tuesday, October 3, 2006, and the early morning hours of Wednesday, October 4, 2006.
Williams was unemployed at the time and had a long history of substance abuse. He was on a crack cocaine binge during the period leading up to the crime and following the crime. In the early morning hours of Tuesday, October 3, 2006, Williams used Dykes’s ATM card to make the following withdrawals: $100 at 12:12 a.m., $100 at 1:49 a.m., $100 at 4:49 a.m., and $200 at 6:06 a.m. These withdrawals left Dykes’s account $294.65 overdrawn. Evidence was presented that when Williams made these withdrawals, he was driving Dykes’s vehicle. He had used Dykes’s vehicle on several occasions over the past months and, at the time of the murder, had no working vehicle of his own.
At 5:12 a.m. that same morning, before the last withdrawal from the bank account, Williams purchased the following items from Walmart: a safety hasp,[2] a brass lock, a sponge, and a “ring light.” A hasp similar to the hasp that Williams purchased was found on the inside of the back door of Dykes’s trailer after the murder. However, the evidence presented at trial did not conclusively establish that the hasp and lock were the same hasp and lock purchased by Williams on October 3.
The morning of October 3, Dykes went to work as a security officer. She called the main office of her employer at 9:30 a.m. to report that she had arrived at the remote job site and to express concern about whether her employment would eon-tinue. In the late afternoon of October 3, Dykes visited her landlord to reimburse him for a water bill that he had paid. This was the last time that Dykes was seen alive by any of the witnesses testifying at trial. Dykes did not show up to work the next day.
Williams spent a large part of the day and evening of October 3 with Callie Williams, using Callie’s car to drive around.[3] Although not living together, Williams and Callie were married and had a child together.[4] Callie testified that she and Williams were together on October 3 from around noon until 9 p.m. They went to the junkyard to get a fuel pump for Williams’s car and smoked crack cocaine. Callie testified that they also went somewhere else that she could not remember. Williams dropped her off at her house at 9 p.m.
She saw Williams again about an hour later at 10 p.m. when he brought more crack cocaine to her house, which they smoked. He drove Dykes’s car and parked it near the house. Then, he left to obtain more drugs. A short period of time later, he came back a final time with more crack cocaine, which they smoked, and he stayed until 4:45 a.m. on Wednesday, October 4. During this last visit, he was wearing different clothing than before. Additionally, instead of parking near the house, he parked in the woods some distance away.
As to the actual circumstances of the crime, the State presented three jailhouse inmates, who testified regarding admis *192 sions Williams made to them. The first, William Hawley, spoke to Williams at the jail. Williams asked Hawley if he knew anything about death penalty cases and showed Hawley the State’s notice of its intent to seek the death penalty. Williams then explained to Hawley that “he was on a crack cocaine binge and that he was using and abusing [Dykes’s] A.T.M. or credit cards” and that “he had a warrant for his arrest and that [Dykes] threatened to turn him in on the warrant because he was using and abusing the cards.” Dykes also threatened to press charges against him for using her ATM cards. Williams “said that they got into a physical confrontation over it; that he beat her with a baseball bat and she died.” Williams told Hawley that “he had been to prison twice before and knew he didn’t want to go back to prison and he had to kill her.”
The second inmate to testify was Billie Franklin Shirah, II. While incarcerated at the Walton County Jail, Shirah spoke about his wife to Williams; Shirah was angry at his wife and told Williams that he felt like killing her. Williams responded: “You don’t want to do that.... You don’t know what it’s like; what you have to live with, not being able to sleep or anything, when you kill someone.” Shirah asked what Williams was talking about. Shirah explained Williams’s response as follows: “And he told me, he said, that Dykes woman. He told me she was coming in with $80 worth of crack every day; he didn’t know where she was getting it from. And he told me he was on drugs and told me he killed her with a ball bat for the drugs.” When asked on cross-examination whether the extent of what Williams admitted was “I killed her because of that crack cocaine,” Shirah answered in the affirmative.
The third and final inmate to testify was Joseph Dewayne Cordell. He and Williams slept in the same cell at the Walton County Jail. Williams relayed the following account of the murder to Cordell: Williams and Dykes were at a friend’s house. They had bought pot and crack and were smoking pot. They were going to smoke the crack, but then Dykes refused and they started arguing because she was not going to give him any crack. They were asked to leave, so they went to Dykes’s house. Dykes confronted Williams about using her ATM card or bank account and said she was not going to smoke crack with him. While they were arguing, they knocked over some tools, and there was a bat. Williams picked up the bat and hit her in the head with it.
The three inmates were consistent in describing a confrontation and a beating death with a bat. Their testimony was inconsistent about the motive for the murder and whether Williams killed Dykes to avoid going to prison, as Hawley stated, over crack cocaine, as Shirah testified, or over whether they were going to smoke crack cocaine together, as Cordell testified.
Dykes’s body was discovered on Saturday, October 7 floating in a nearby lake in a badly decomposed state. Her body was found tied to three cinderblocks — one attached to her chest, one attached to her waist, and one attached to her feet. All of the cinderblocks were tied to the body with a flat, thin nylon rope of the brand Nefco Incorporated, with the words “1,800 LB MULETAPE” stamped on it. A piece of the same type of rope was also tied through her mouth and around the back of her head with no cinderblock attached to it.
Investigators observed the following at Dykes’s trailer. The back door of the trailer’s locking mechanism was flimsy and easily pried open, but the door was additionally secured with a hasp and lock; the front door was securely locked and did not *193 have a hasp and lock on it. Inside the trailer, investigators found blood in the master bedroom and a small aluminum tee ball bat inside the closet in the master bedroom, which had blood on it later identified as belonging to Dykes.[5]
As to the manner in which Dykes died, the medical examiner, Dr. Cameron Francis Snider, testified to five injuries consistent with the head being struck by the aluminum tee ball bat. The medical examiner was unable to testify without speculating about whether Dykes remained conscious after the first blow with the bat and further stated that any of the blows could have caused unconsciousness and death.
There was extensive evidence introduced at trial about Williams’s post-murder attempts to cover up the crime by cleaning up the crime scene and disposing of the body in the lake. In particular, Williams was seen by two of Dykes’s neighbors at around 6 or 6:30 a.m. on Wednesday, October 4, driving Dykes’s car with a flat-bottom aluminum boat tied to the top. The boat was later identified as belonging to Callie’s father. The aluminum boat, more of the same brand of rope that was found on the body and cinderblocks were found at Dykes’s trailer. A pair of Dykes’s jeans with her blood on them was found in a clothes hamper in the master bedroom. Williams also apparently attempted to use carpet cleaner to clean up blood in the master bedroom of the trailer. Finally, as to Williams’s actions after the murder, Williams called Callie from jail on October 8 and asked her to go to Dykes’s trailer, look underneath an aluminum boat leaned against the back of the trailer, retrieve a blanket and some ropes from underneath the boat, and put the items in his car.[6]
The jury found Williams guilty of first-degree premeditated murder with a weapon.

The Penalty Phase, Spencer Hearing, and Trial Court’s Order

During the penalty phase, the State presented no evidence, electing to rest upon the evidence presented in the guilt phase. The defense presented three witnesses— one expert witness and two lay witnesses. The expert witness was Dr. James D. Larson, a licensed psychologist. The penalty phase testimony will be described in further detail in this Court’s proportionality discussion. Ultimately, the jury recommended death by a vote of eleven to one.
Subsequently, the trial court held a Spencer[7] hearing, at which time both Williams and the State were given an opportunity to present additional evidence. The State presented victim impact testimony from Dykes’s son and daughter. Williams also testified — he described his background and difficult childhood and gave an account of the events surrounding the murder. He denied killing Dykes. Rather, he claimed that he found her dead the morning of October 3 when he returned to the trailer between ATM withdrawals. He stated that there was already a hasp and lock on the back door of the trailer and that he had bought the hasp and lock for the front door after discovering Dykes’s body, but never installed them. He did admit, however, to obtain *194 ing Callie’s father’s boat and using it to dispose of Dykes’s body in the lake.
In sentencing Williams, the trial court found four aggravators: (1) the crime was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (2) the crime was committed for pecuniary gain; (3) the crime was especially heinous, atrocious, or cruel (HAC); and (4) the crime was committed in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification (CCP). The trial court did not assign any weight to the aggravators that were found.
The trial court also rejected the only statutory mitigator requested by Williams — that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. However, the trial court found the following nonstatutory mitigators to which it assigned moderate weight: (1) Williams had a history as a polysubstance abuser, having used such substances as cocaine, crystal methamphetamine, and prescription medication; Williams was on a crack cocaine binge at the time of the murder and was chemically dependent at the time of the crime; and Williams participated in an outpatient substance abuse treatment program approximately ten to twelve months before the murder; (2) Williams had a chaotic and unstable childhood; and (3) Williams had good relationships with family members, had exhibited a caring and loving attitude for his children, and desired to maintain good father-child relationships during imprisonment. The trial court found other nonstatutory mitigators to which it assigned little weight: (1) psychological testing showed that Williams would not likely cause any violence in a controlled population such as prison; (2) Williams’s psychological testing showed that he was not a psychopath; (3) Williams appeared to have neuropsychological impairment, which may be classifiable as fetal alcohol syndrome; and (4) Williams was a kind, courteous, and gentle friend and hard worker for his employer, Pam Miller.
On appeal, Williams attacks each of the four aggravators found and the trial court’s failure to find the mitigating factor that Williams’s addiction to crack cocaine substantially impaired his ability to conform his behavior to the requirements of the law at the time of the homicide, among other claims.[8]
ANALYSIS

Standard of Review as to Aggravating Circumstances

The State has the burden to prove beyond a reasonable doubt each and *195 every aggravating circumstance that it alleges. In this case, Williams asserts there was not competent, substantial evidence to support the findings of the trial court of aggravating circumstances beyond a reasonable doubt and that the evidence is speculative as to each of the aggravators. “The standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating circumstance is that of competent, substantial evidence.” Guardado v. State, 965 So.2d 108, 115 (Fla.2007). “When reviewing a trial court’s finding of an aggravator, ‘it is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job.’ ” Aguirre-Jarquin v. State, 9 So.3d 593, 608 (Fla.2009) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)), cert. denied, — U.S. -, 130 S.Ct. 1505, 176 L.Ed.2d 118 (2010). Rather, it is this Court’s task on appeal “to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.” Id. (quoting Willacy, 696 So.2d at 695). With this in mind, we review each of the aggravating circumstances.

CCP Aggravator

In order to establish the CCP aggravator, the evidence must show: (1) “the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold)”; (2) “the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated)”; (3) “the defendant exhibited heightened premeditation (premeditated)”; (4) “the defendant had no pretense of moral or legal justification.” Franklin v. State, 965 So.2d 79, 98 (Fla.2007). ‘“CCP involves a much higher degree of premeditation’ than is required to prove first-degree murder.” Deparvine v. State, 995 So.2d 351, 381-82 (Fla.2008) (quoting Foster v. State, 778 So.2d 906, 921 (Fla.2001)). “Premeditation can be established by examining the circumstances of the killing and the conduct of the accused.” Franklin, 965 So.2d at 98. Further, “the evidence must prove beyond a reasonable doubt that the defendant planned or prearranged to commit murder before the crime began.” Thompson v. State, 565 So.2d 1311, 1318 (Fla.1990). “The CCP aggravator can ‘be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.’” Franklin, 965 So.2d at 98 (quoting Swafford v. State, 533 So.2d 270, 277 (Fla.1988)).
In finding that this aggravating circumstance had been proven beyond a reasonable doubt, the trial court stated:
Kirk Williams’ decision to kill Susan Dykes, however poorly conceived, was made in the early morning hours of Tuesday, October 3rd, 2006, as he realized that he would be going to prison if she lived to charge him with grand theft. At about 5:12 a.m., on October 3rd, 2006, the defendant purchased the hasp and lock at Walmart with the intent to secure the eventual crime scene. The timing of the hasp and lock purchase and its installation on the rear door of the trailer leads to the conclusion that the defendant planned to commit the murder and secure the crime scene. The defendant had time to reflect on his planned murder of Susan Dykes and did so. The testimony of William Hawley was that the defendant told him that he committed the murder because he knew he would go back to prison.
*196 The defendant (at the Spencer hearing) testified that he purchased the hasp and lock for the purpose of securing the door to Susan Dykes’ trailer. This admission by the defendant confirms that the purchase of the hasp and lock was done with an intent to kill Susan Dykes.
Williams argues that there was not competent, substantial evidence to support the trial court’s finding of this aggravator. We agree.
In this case, virtually all of the evidence is inconsistent with the murder being preplanned. In fact, the direct evidence — the testimony of the three jailhouse witnesses — was consistent in one important aspect. The three jailhouse witnesses all testified that Williams was on drugs at the time of the murder and that the killing occurred after Williams and Dykes got into an argument that ended with his beating her with a bat.
The trial court found that Williams’s decision to kill, “however poorly conceived, was made in the early morning hours of Tuesday, October 3rd, 2006, as he realized that he would be going to prison if she lived to charge him with grand theft.” However, there is no indication that Williams feared at the time that he was withdrawing money that Dykes would charge him with grand theft. In fact, the record established that previously, in August 2006, Williams withdrew $200 from Dykes’s account, which left the account overdrawn. Dykes did not press charges against Williams for this withdrawal, and Williams and Dykes lived together after that time.
All of the hallmarks of a killing that has been found to be CCP are missing in this case, including “such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.” Franklin, 965 So.2d at 98 (quoting Swaf-ford, 533 So.2d at 277). As to the weapon, unlike other cases, in this case there was no evidence that the bat, described alternatively as a ball bat or tee ball bat, was procured in advance. See, e.g., Wright v. State, 19 So.3d 277, 300 (Fla.2009) (upholding CCP where defendant obtained firearm in advance, abducted and forced victims to drive to remote area where there would be no witnesses, and shot the victims multiple times execution-style); Eaglin v. State, 19 So.3d 935, 948 (Fla.2009) (upholding CCP where defendant obtained the murder weapon in advance and made statements before the murder that indicated an intent to kill).
Further, the actions of Williams on the day and evening of the crime are not indicative of a “careful plan or prearranged design” or a heightened premeditated intent to murder Dykes. The trial court hinged its finding on the purchase of the hasp and lock at 5:12 a.m. However, at the time of purchasing the hasp and lock, Williams also purchased two other common household items unrelated to the murder: a sponge and a ring light. After purchasing the hasp and the lock, Williams did not return home and murder Dykes that morning. Rather, Dykes went to work later that morning, and Williams spent the day with his wife, engaging in activities unrelated to planning the murder. Additionally, although there was extensive evidence of actions that Williams took after the murder, there is no evidence that Williams procured any of the items he used to dispose of the body prior to the murder.
While it is true that the hasp and lock could have been purchased with the intent to secure the scene of a murder that had yet to occur, that conclusion is speculative. While circumstantial evidence can be used to support CCP, “the circumstantial evidence must be inconsistent with any *197 reasonable hypothesis which might negate the aggravating factor.” Harris v. State, 843 So.2d 856, 866 (Fla.2003) (quoting Hildwin v. State, 727 So.2d 193, 194 (Fla.1998)). In this case, there was no proof, and certainly not proof beyond a reasonable doubt, that the hasp and lock purchased by Williams were the same, hasp and lock found securing the back door after the murder. In fact, the lead investigator in the case testified that the presence of a hasp and lock on the door of the trailer was not unusual or significant in and of itself because he had “been to other scenes where [he had] seen the same thing.”
We recognize that the trial court also relied on the Spencer hearing testimony of Williams in which he stated that he purchased the hasp and lock to secure the trailer. We begin by noting that since Williams testified at the Spencer hearing, the jury was not presented with his testimony. Further, even though the trial court had Williams’s testimony before it, the purchase of the hasp and lock is the only piece of evidence that could be construed as evidence of advance planning. All of the other evidence presented establishes that the provocation for the murder arose at the time of the argument. In particular, the direct evidence of the murder — the testimony of all three inmates— indicates that this was a spontaneous murder that happened during the course of an argument between Williams and Dykes over crack cocaine or when she confronted him about using her ATM card.
When examining Williams’s Spencer hearing testimony, the trial court considered Williams’s statement that he purchased the hasp and lock in isolation. Williams also testified that he purchased the hasp and lock after he found Dykes already dead and, further, that he intended to use them to secure the front door but never installed them. Investigators did not find the front door secured with a hasp and lock after the murder, but rather the back door. Williams testified that the back door was already secured with a hasp and lock prior to October 3. In sum, his testimony does not support a conclusion that the purchase was made with the intent to kill and does not support a finding of CCP beyond a reasonable doubt.
Finally, although not dispositive, this was not an execution-style murder, which is the classic situation in which CCP has been found. See, e.g., Eutzy v. State, 458 So.2d 755, 757 (Fla.1984) (finding CCP where defendant procured a gun in advance and the victim was shot once in the head, execution-style).
The case of Mahn v. State, 714 So.2d 391 (Fla.1998), where this Court struck the CCP aggravator, is instructive. In that case, the defendant was convicted of killing his father’s live-in girlfriend and her son. Id. at 393. The defendant confessed that he was on drugs at the time, that he entered the son’s room, and that he stabbed the son with a knife he had obtained from the kitchen. Id. at 394. When the son screamed, the defendant’s father’s girlfriend came into his room, and the defendant stabbed her also. Id. Then he fled the scene. Id. This Court found insufficient evidence of the heightened premeditation required to establish CCP:
There is no evidence that Mahn acted in the deliberate, professional, and coldly calculating manner that is required to establish this aggravator. The evidence reflects that Mahn, using hastily obtained weapons of opportunity, carried out the attacks in a haphazard manner, striking out at Debra, for example, when she confronted him after the attack on Anthony, and then fled in a panic.
Id. at 398.
There are similarities between Mahn and the instant case. In this case, the *198 testimony of the inmates shows that the intent to kill Dykes arose during an argument with Dykes when she threatened to press charges and refused to share or smoke crack cocaine with Williams, which is evidence that Williams did not act in a “deliberate, professional, and coldly calculating manner.” Id. Further, like the defendant in Mahn, Williams also used a “weapon of opportunity” — the aluminum tee ball bat. As Cordell testified, Williams “said they were just arguing and then he said they had knocked some tools or something over and there was a bat of some kind. And he said he picked it up and hit her in the head with it.”
In sum, the direct evidence of the murder — the inmates’ testimonies — shows that this was not a preplanned killing that would meet the heightened premeditation standard required for CCP. Rather, the inmates’ testimonies show that the murder arose as part of a spontaneous and unplanned fight. Further, in contrast to other cases where this Court has upheld CCP,[9] there was no advance procurement of a weapon or means to dispose of the body or other evidence of preplanning. For all of these reasons, we strike CCP as not being supported by competent, substantial evidence in this case.

HAC Aggravator

This Court has explained the HAC aggravator as follows:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies— the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
Hernandez v. State, 4 So.3d 642, 668-69 (Fla.2009) (quoting State v. Dixon, 283 So.2d 1, 9 (Fla.1973)), cert. denied, — U.S. -, 130 S.Ct. 160, 175 L.Ed.2d 101 (2010). Further, “[t]he HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death.” Id. at 669 (quoting Brown v. State, 721 So.2d 274, 277 (Fla.1998)).
This Court has “consistently upheld HAC in beating deaths.” Douglas v. State, 878 So.2d 1246, 1261 (Fla.2004) (quoting Lawrence v. State, 698 So.2d 1219, 1222 (Fla.1997)); see, e.g., Dennis v. State, 817 So.2d 741, 766 (Fla.2002) (upholding HAC where both victims suffered skull fractures and were conscious for at least part of the attack as evidenced by defensive wounds to their hands and forearms); Bogle v. State, 655 So.2d 1103, 1109 (Fla.1995) (upholding HAC where the victim was struck seven times on the head, victim was alive during infliction of most of the wounds, and the last blows caused death); Wilson v. State, 493 So.2d 1019, 1023 (Fla.1986) (upholding HAC where the *199 victim was brutally beaten while attempting to fend off the blows before being fatally shot).
However, in order to support a finding of this aggravator, “the evidence must show that the victim was conscious and aware of impending death.” Douglas, 878 So.2d at 1261; see, e.g., Zakrzewski v. State, 717 So.2d 488, 493 (Fla.1998) (striking HAC where “[m]edical testimony was offered during the trial which established that [the victim] may have been rendered unconscious upon receiving the first blow from the crowbar, and as a result, she was unaware of her impending death”); Simmons v. State, 419 So.2d 316, 317, 319 (Fla.1982) (striking HAC where “[d]eath was probably instantaneous or nearly so; an expert testified that either of the two blows could have caused instantaneous death by itself’).
In finding that this aggravating circumstance had been proven beyond a reasonable doubt, the trial court stated in relevant part:
The multiple lacerations and locations of the lacerations around the head indicate that Susan Dykes’ head was moving as the blows were inflicted. No other reasonable conclusion can be drawn other than Susan Dykes was conscious and standing at least long enough for the blood from her head injuries to reach both the front and back sides of her jeans in the manner in which the jeans are blood-stained. Susan Dykes was without a doubt acutely aware of her impending death and the pain associated with the terrible blows (which bent the aluminum bat). Then, while Susan Dykes was obviously still alive, the defendant gagged her with some of the muletape rope; there is no need to gag a dead person.
Williams argues that there was not competent, substantial evidence to support the trial court’s finding that Dykes was conscious during the attack. An examination of the record supports Williams’s argument.
The trial judge’s first finding that the multiple lacerations and locations of the lacerations indicate that Dykes’s head was moving as the blows were inflicted — and thus she was conscious — is not supported by the record and appears to be speculation. The record reflects only where the blows were located and the lengths of the lacerations. There is no testimony in the record as to why the blows were delivered to different parts of Dykes’s head or what the pattern of blows indicates. The blows to different parts of her head could simply have been from Williams swinging the bat from side-to-side or from her head being moved by the force of the blows. There is absolutely no expert testimony to support the trial court’s contrary conclusion.
The trial judge’s second finding was that the blood on the jeans indicated that Dykes was conscious and standing at least long enough for the blood to reach both the front and back sides of her jeans. This finding is also not supported by the record and appears to be speculative. The evidence established only that the jeans had areas of blood on them — including “in the crotch area on the outside that went down around to the butt area of the jeans” — and that the blood belonged to Dykes. There was no testimony or evidence presented as to how the blood likely got on the jeans, as to what the pattern of blood on the jeans indicated (i.e., whether it was blood spatter consistent with blows being delivered to the head, whether it was consistent with blood dripping from the head wounds, or whether the blood could have been transferred to the jeans from other blood present at the crime scene), or that the blood on the jeans indicated that *200 Dykes was standing while the blows were delivered.
Finally, the trial court found that “while Susan Dykes was obviously still alive, the defendant gagged her with some of the muletape rope; there is no need to gag a dead person.” Once again, there is no evidence in the record that Dykes was alive or conscious and the trial court’s contrary conclusion is speculative and unsupported by any expert testimony. There was no testimony as to the purpose of the rope through the mouth or that it could even be characterized as a “gag,” aside from the brief, interrupted questioning of Dr. Snider as to how many bodies he had “examined that were supposed to be dead [that] have had a rope tied holding their mouth in place.” However, neither Dr. Snider nor any other testifying witness ever actually opined that the rope through Dykes’s mouth was a gag or that it had been placed there while she was still alive or even while she was still conscious. The only evidence presented at trial was an autopsy photograph depicting a rope through Dyke’s mouth. However, there were various other ropes found tied to her body, which matched the type of rope found through her mouth. The rope through the mouth could have been placed there for other reasons other than to constitute a “gag” and could have been placed there after she was dead.
In further support of his argument, Williams points out that the medical examiner testified that the first blow could have resulted in death or unconsciousness and that the entire attack could have taken place in seconds.[10] We agree that the medical examiner’s testimony does not support a finding of HAC.
Dr. Snider testified that the cause of death was “blunt head trauma, or the injuries of the head.” However, he testified that any of the five blows to the head could have rendered Dykes unconscious or caused death. Further, the evidence presented did not establish the existence of any defensive wounds. The existence of a defensive wound is relevant to the HAC analysis — this Court has “affirmed findings of HAC where defensive wounds revealed awareness of impending death.” Guardado, 965 So.2d at 116 (“[T]he victim did not lose consciousness quickly after the initial blows to her head. The defensive wounds are indicative of consciousness up to the time of the fatal stab wound to the heart.”). Here, Dr. Snider was not able to conclude that Dykes sustained any defensive wounds during the beating; rather, he was only able to state that an area of injury found on her right hand could have been a defensive wound or just as likely could have been the result of animal predation while the body was in the lake.
In sum, the evidence in this case does not establish whether Dykes was killed or rendered unconscious by the first blow to the head or whether she remained conscious throughout the attack. The medical examiner testified that any of the blows to the head could have rendered Dykes unconscious or caused death. The findings relied upon by the trial court to determine that Dykes was conscious during the attack — the blood on the jeans, the rope through Dykes’s mouth, and the locations of the lacerations on Dykes’s head — were speculative.
The instant case is analogous to Zakrzewski v. State, where this Court struck HAC. In that case, the defendant murdered his wife, Sylvia, and his two children *201 after being notified that Sylvia wanted a divorce. Zakrzewski, 717 So.2d at 490. After his family arrived home, the defendant approached Sylvia, who was sitting alone in the living room, and hit her at least twice over the head with a crowbar. Id. The testimony at trial established that she “may have been rendered unconscious as a result of these blows, although not dead.” Id. The defendant then dragged her into the bedroom, where he hit her again and strangled her with rope. Id. This Court concluded that the trial court’s finding of HAC was in error, because “[m]edical testimony was offered during the trial which established that Sylvia may have been rendered unconscious upon receiving the first blow from the crowbar, and as a result, she was unaware of her impending death. We have generally held awareness to be a component of the HAC aggravator.” Id. at 493. Likewise, in this case, the medical examiner testified that Dykes could have been rendered unconscious by the first blow and that the first blow could have caused her death. Additionally, there is no other evidence in the record that Dykes was conscious during the beating and thus aware of her impending death. For all these reasons, we strike HAC as not being supported by competent, substantial evidence.

Pecuniary Gain Aggravator

We next discuss the pecuniary gain aggravator. To establish the aggra-vator that the murder was committed for pecuniary gain, “the State must prove beyond a reasonable doubt that the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain.” Deparvine, 995 So.2d at 382 (quoting Finney v. State, 660 So.2d 674, 680 (Fla.1995)). “The pecuniary gain factor is permitted where the murder ‘is an integral step in obtaining some sought-after specific gain.’ ” Brooks v. State, 918 So.2d 181, 206 (Fla.2005) (quoting Hardwick v. State, 521 So.2d 1071, 1076 (Fla.1988)).
Neither the State nor the trial court relied on the ATM withdrawals as a motive for the murder. The factors relied on by the trial court to support the pecuniary gain aggravator — that Williams continued to use Dykes’s car, home, and personal property in her home after her death, that he was destitute with no job, no money, no home, and no operable vehicle, and that he was anxious to satisfy his crack cocaine addiction — are purely circumstantial. “[Although an aggravating factor may be supported entirely by circumstantial evidence, ‘the circumstantial evidence must be inconsistent with any reasonable hypothesis which might negate the aggravating factor.’” Harris, 843 So.2d at 866 (quoting Hildwin, 727 So.2d at 194).
The circumstantial evidence is consistent with the reasonable hypothesis that after Dykes’s murder, Williams simply continued to use her vehicle, home, and personal property within the home without having considered the use of those items as a motivation for the murder. In this case, Williams was living with Dykes prior to her death and already had the use of her vehicle and personal property within her home. Several witnesses testified that Williams was allowed to use Dykes’s vehicle on prior occasions. In fact, Williams had used Dykes’s vehicle in the early morning hours of October 3 but then spent the day with Callie using her vehicle. Although Williams depleted Dykes’s bank account, the evidence established that this was done before her death and was not a motive for the murder.
Rather, as explained in the facts and in our discussion of the avoid arrest aggravator, the motivation for the murder arose at the time that a spontaneous fight erupted, *202 and the trial court found that the dominant motive for the murder was to avoid arrest, a conclusion with which we agree. Although avoid arrest was the dominant motive for the murder, this does not negate the possibility that there was also another motive for the crime. However, none of the inmates’ testimony indicated a pecuniary gain motive for this crime and, while Williams may have received a pecuniary benefit from the murder, there is not competent, substantial evidence that pecuniary gain was a motive for the murder.
This case is distinguishable from the cases cited by dissent, dissenting op. at 208-09, all of which contained facts indicating that the defendant was motivated, at least in part, by pecuniary gain. See Orme v. State, 25 So.3d 536, 550 (Fla.2009) (“Orme’s motivation to kill Redd was, at least in part, due to his desire to obtain her money, jewelry, and car so he could ride around town, purchase more drugs, and party with the another [sic] woman all night. Moreover, the trial court convicted Orme of robbery, which was affirmed by this Court on direct appeal. The robbery conviction coupled with the evidence presented by the State that Orme took Redd’s purse and keys to joyride in her car all night after he murdered her provides competent, substantial evidence to affirm the trial court’s finding of the pecuniary gain aggravator.”); Deparvine v. State, 995 So.2d 351, 377, 382 (Fla.2008) (stating that defendant “executed a well-thought out and time-consuming plan to acquire the [victim’s] truck” and the “victim’s truck was discovered in Deparvine’s possession after the murders”); Huggins v. State, 889 So.2d 743, 770 (Fla.2004) (“[T]he evidence established that Huggins did not own a car during the relevant time period and utilized the victim’s vehicle for over two weeks after her murder. Furthermore, Huggins and Larson were strangers to each other, and nothing in the evidence suggests Huggins was motivated to commit the crime for another reason. Finally, the jury unanimously convicted Huggins of carjacking and petit theft.”); Rogers v. State, 783 So.2d 980, 990, 993 (Fla.2001) (holding that evidence that defendant took the victim’s vehicle, wallet, purse, and jewelry supported robbery conviction as well as pecuniary gain aggravator); Jones v. State, 690 So.2d 568, 570 (Fla.1996) (“Although Jones already had physical possession of the car at the time of the crimes, based on the evidence in this case there is no reasonable hypothesis other than that Jones murdered Monique Stow and attempted to murder Ezra Stow in order to obtain ownership of the car and to resolve the problem over the dishonored check. The fact that the car papers were missing from Ezra Stow’s desk after the murder and attempted murder support this finding as does the fact that after committing the crimes Jones disposed of the car papers and the gun and hid the car.”); Lambrix v. State, 494 So.2d 1143, 1145 (Fla.1986) (upholding pecuniary gain where defendant met victim in a tavern, murdered the victim, and stole her car after the murder). We conclude that the mere fact that Williams “retained pecuniary benefits by killing Ms. Dykes,” dissenting op. at 209, without more, does not support a conclusion that pecuniary gain was a motive for the murder.

Avoid Arrest Aggravator

We finally discuss the avoid arrest aggravator. “To establish the avoid arrest aggravating factor where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness.” Connor v. State, 803 So.2d 598, 610 (Fla.2001) (citing Alston v. State, 723 So.2d 148, 160 (Fla.1998)). Unless the victim is a law *203 enforcement officer, the State must prove beyond a reasonable doubt that the sole or dominant motive for the murder was to avoid arrest, and “proof of the intent to avoid arrest or detection must be very strong.” Hernandez, 4 So.3d at 667 (citing Riley v. State, 366 So.2d 19, 22 (Fla.1978)). This Court has explained that “[m]ere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator.” Id. (quoting Consalvo v. State, 697 So.2d 805, 819 (Fla.1996)).
This Court has approved the finding of the avoid arrest aggravator based on admissions of the defendant in some cases, such as where a defendant makes statements indicating his fear of arrest. Hernandez, 4 So.3d at 667. Such admissions constitute direct evidence of the motive for the murder. Williams argues that the evidence in this case shows that the primary reason for the murder was an argument over drugs or Williams’s use of Dykes’s ATM card. For the reasons that follow, we conclude that competent, substantial evidence supports the finding of this ag-gravator.
The trial court relied on the testimony of jailhouse witness Hawley, who testified regarding his conversation with Williams regarding the motive for the murder:
Q. Mr. Hawley, what did he tell you about what happened to Susan Dykes?
A. He explained to me that — what he was charged with. He was on a crack cocaine binge and that he was using and abusing her A.T.M. or credit cards. He said that he was wanted; he had a warrant for his arrest and that she threatened to turn him in on the warrant because he was using and abusing the cards. He said she was threatening to have him prosecuted for that as well; press charges on him.
Q. What did he say he did to her?
A. He said that they got into a physical confrontation over it; that he beat her with a baseball bat and she died. And he said he took the body out to Lake Cassy or Cassidy — I’m not from this area; I have no clue; I just wrote it down a day later — that he wrapped her up in a rope and blanket and he threw her in a lake. I guess she floated up. I’m trying to think what else he told me. That he had been to prison twice before and knew he didn’t want to go back to prison and he had to kill her.
[[Image here]]
Q. All right. Mr. Hawley, you said that he characterized it as a confrontation between he and Susan Dykes; is that correct?
A. Yes, sir.
Q. Was that the word he used; “confrontation”?
A. I honestly don’t remember. I’m not going to say that precise. I don’t know exactly how he put it, but he said they got into it over him using the credit cards and he was on a crack cocaine binge.
Q. Did he claim in any way to you that it was a self-defense act?
A. No.
Q. Did he claim that she struck him in any way?
A. No.
Q. So he claimed only that he feared her charging him with the A.T.M. transactions?
A. Right. And he knew that once he started, that he had to not only kill her, but get rid of the body so that he wouldn’t be charged with it because he did not want to go back to prison. He told me he was there I think for possession of a — felon in possession of a shotgun or something.
*204 In finding that this aggravating circumstance had been proven beyond a reasonable doubt, the trial court stated in relevant part:
The testimony of prisoner William Haw-ley, a cellmate of the defendant at the county jail after defendant’s arrest, is direct evidence that establishes beyond a reasonable doubt that the defendant acted upon his fear of arrest and imprisonment. Hawley credibly testified that the defendant admitted to him that he had robbed the victim’s checking account, that she threatened to turn him in for prosecution, and that he killed her because he did not want to go back to prison as he had been there before. This was clearly the dominant motive for the defendant’s murder of Susan Dykes.
Williams claims that the testimony of Hawley as to the motive for the crime is inconsistent with the testimony of Shirah and Cordell and that this inconsistency negates avoiding arrest as the primary motive for the killing. Shirah testified that “she was coming in with $80 worth of crack every day; he didn’t know where she was getting it from. And he told me he was on drugs and told me he killed her with a ball bat for the drugs.” Cordell testified that Dykes confronted Williams about using her ATM card and stated that she “wasn’t going to smoke crack with him”; while they were arguing, they knocked over some tools and there was a bat and Williams picked up the bat and hit her in the head with it.
Although the testimony of two of the three inmates does not reflect an avoid arrest motive, the trial court determined that Hawley’s testimony on this issue was “credible].” This is “significant in light of the trial court’s superior vantage point to assess” the witness’s credibility. Hernandez, 4 So.3d at 668. The testimony of a witness that reflects admissions made by a defendant is direct evidence of the defendant’s motive. Because the testimony of Hawley is direct evidence that avoiding arrest was the main motive for the otherwise spontaneous killing, we conclude that in this case there is competent, substantial evidence to support the trial court’s finding that Williams’s dominant motive for the murder was to avoid arrest.

Statutory Mitigation

The trial court rejected the statutory mitigator that Williams’s capacity to conform his conduct to the requirements of law was substantially impaired. Rather, the trial court recognized that Williams had a cocaine addiction but concluded that his addiction led him to the conscious choices of stealing “the victim’s money and then ... deliberately murderfing] her to avoid the consequences.”
The trial court must find a mitigating circumstance if it “has been established by the greater weight of the evidence.” Coday v. State, 946 So.2d 988, 1008 (Fla.2006). “However, a trial court may reject a proposed mitigator if the mitigator is not proven or if there is competent, substantial evidence to support its rejection.” Id. When expert opinion evidence is presented, it “may be rejected if that evidence cannot be reconciled with the other evidence in the case.” Id. Trial judges have broad discretion in considering unrebutted expert testimony; however, the rejection of the expert testimony must have a rational basis, such as conflict with other evidence, credibility or impeachment of the witness, or other reasons. Id. at 1005.
Dr. Larson’s unrebutted expert testimony was that Williams’s capacity to conform his conduct to the requirements of law was substantially impaired “[b]ecause he was basically strung out on crack cocaine or on a cocaine binge” at the time of the mur *205 der.[11] The fact that Williams was on a crack cocaine binge at the time of the murder was also corroborated by testimony from Callie that she and Williams smoked crack cocaine throughout the day and night of October 3 and the morning of October 4.
Although the trial court rejected this statutory mitigator, it found as a nonstatu-tory mitigator that Williams was a “poly-substance abuser” and that “the defendant was on a cocaine binge at the time of the murder and was chemically dependent at the time of the crime.” The trial court therefore found credible the testimony that Williams’s drug addiction played a part in the murder and that he was on a cocaine binge at the time. However, the trial court rejected the testimony of the only expert who testified on this matter, Dr. Larson, without providing “a rational basis,” Coday, 946 So.2d at 1005, such as impeachment of Dr. Larson’s testimony or other evidence that conflicted with Williams being on a crack cocaine binge at the time of the murder such that his capacity to conform his conduct to the requirements of the law was substantially impaired. We conclude that the trial court erred in rejecting the statutory mitigation.

Proportionality

We finally address the issue of proportionality. As we have previously stated, in determining whether death is a proportionate penalty in a given case:
“[W]e make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” We consider the totality of the circumstances of the case and compare the case to other capital cases. This entails “a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.” In other words, proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.”
Offord v. State, 959 So.2d 187, 191 (Fla.2007) (citations omitted). The Eighth Amendment to the United States Constitution and this Court’s proportionality review require that the death penalty “be reserved only for. those cases that are the most aggravated and least mitigated.” Crook v. State, 908 So.2d 350, 357 (Fla.2005).
After our analysis in this case, the only valid aggravating circumstance remaining is avoid arrest. We have struck the ag-gravators of CCP and HAC, which are considered “two of the most serious aggra-vators set out in the statutory sentencing scheme.” Buzia v. State, 926 So.2d 1203, 1216 (Fla.2006) (quoting Larkins v. State, 739 So.2d 90, 95 (Fla.1999)). The circumstances of the murder reveal a spontaneous killing fueled by an argument about the continued use of crack cocaine or Dykes’s threat during an argument that she was going to press charges against Williams for the unauthorized ATM with *206 drawals. In addition, while not determinative, this case does not involve the prior violent felony aggravator. Although Williams had a prior criminal history, his history was not one of violence.[12]
This Court has previously explained that “absent unusual circumstances, ‘death is not indicated in a single-aggravator case where there is substantial mitigation.’” Green v. State, 975 So.2d 1081, 1088 (Fla.2008) (quoting Almeida v. State, 748 So.2d 922, 933 (Fla.1999)). We review the mitigation presented that was not rebutted by the State.
The defense presented three witnesses — one expert witness and two lay witnesses. Through the expert witness, Dr. Larson, the following picture emerged. Williams had a history of polysubstance abuse, including crystal methamphetamine, cocaine, crack, various pharmaceutical medications, and possibly others. Williams had previously been treated for substance abuse in the form of court-ordered classes.
Williams had an extremely disadvantaged childhood. Not only was he raised without a father, but when he was two years old, his mother and stepfather were accused of child abuse when a sibling of Williams died. As a result, his mother and stepfather served a prison term. During this time, Williams lived with his aunt, Betty Gulliver. After his mother was released from prison, Williams moved back in with her. However, when Gulliver found out that his mother had put him up for adoption, Gulliver took care of him until she became ill. After Gulliver became ill, Williams was placed back with his mother. Within a short period of time, his mother arranged for him to live with cousins in Georgia for some period of time. As a teenager, Williams was then placed in foster care until he was seventeen or eighteen. Dr. Larson concluded that Williams “had quite a chaotic childhood background” and briefly stated that the childhood “also included physical and sexual abuse.”
Dr. Larson also testified as to Williams’s mental impairments. Williams was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) as a child and was treated with medication (Ritalin) for a few years. Dr. Larson administered a variety of psychological tests on Williams and concluded that the results of the tests were indicative of underlying brain damage. In particular, the results of the IQ tests showed a significant disparity between Williams’s verbal IQ and performance IQ. Dr. Larson stated that this disparity was indicative of brain damage or a learning disability and was one of the reasons he believed that Williams had “Alcohol Fetal Effects Syndrome.”[13] Another test revealed that Williams was at the eleventh or twelfth grade level in reading comprehension and spelling, while he was at the fourth grade level in math computation. Dr. Larson opined that this discrepancy was also indicative of underlying brain damage. Dr. Larson also concluded that Williams was not malingering.
Dr. Larson also administered personality tests. The tests revealed that Williams did not have socially deviant attitudes. During testing, Williams complied with everything requested of him, he was polite, *207 and he expressed no negative attitudes or hostility. Further, Williams did not have any well-defined personality disorders; however, Williams is dependent on other people emotionally, he has borderline personality features, meaning that his personality is not very stable interpersonally, and he has some antisocial personality features, which is expected given the history of drug abuse. Williams is the type of person to be dependent on another person, to abuse substances, and who would not be overly ambitious in life or do particularly well economically.
Dr. Larson also assessed how well Williams would do in a prison population. He concluded that Williams is at low risk for future violence in a controlled population. Dr. Larson opined that he would not expect Williams to be dangerous in a criminal population.
Finally, Dr. Larson opined that Williams’s capacity to conform his conduct to the requirements of law was substantially impaired “[b]ecause he was basically strung out on crack cocaine or on a cocaine binge” at the time of the murder. Dr. Larson also testified that he believed the murder was not characteristic of the way that Williams lives his life, but rather that the incident was situational — a function of the cocaine binge and the situations that evolved during the cocaine binge, including the desire to obtain more cocaine.
The defense also presented the testimony of Gulliver, Williams’s aunt. She verified the details of Williams’s childhood and how he was passed back and forth between her and Williams’s mother and eventually placed in foster care. She further testified that Williams has two daughters, one of whom lives with her, and that Williams showed affection toward his children.
Finally, the defense’s last witness, Pam Miller, testified that Williams worked for her business and that he was a good employee, a hard worker, and courteous to customers. Miller also testified that Williams was a good father.
Even though the trial court rejected the statutory mitigator, the trial court gave moderate weight to defendant’s history as a polysubstance abuser having used such substances as cocaine, crystal methamphetamine, and prescription medication and found that Williams was on a crack cocaine binge at the time of the murder and was chemically dependent at the time of the crime. The trial court also found and gave moderate weight to Williams’s chaotic and unstable childhood as well as his positive relationships with family members, his caring and loving attitude toward his children, and his desire to maintain good father-child relationships during imprisonment.
In summary, this case involves only one aggravator and statutory as well as non-statutory mitigation. The evidence demonstrates that this murder occurred after an argument erupted between Williams and Dykes, with whom Williams had lived for several months. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993) (vacating death sentence where there were two ag-gravators (prior violent felony and HAC) and substantial mitigation and the evidence “in its worst light suggest[ed] nothing more than a spontaneous fight”). Williams is undeniably guilty of this crime and will spend the rest of his life in prison as a result. However, this crime is not one of the most aggravated and least mitigated, and accordingly we conclude that the imposition of the death penalty is not a proportionate penalty.
CONCLUSION
For the reasons stated, we reverse Williams’s sentence of death and remand the case to the trial court for imposition of *208 a sentence of life without the possibility of parole.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, LABARGA, and PERRY, JJ., concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which CANADY, J., concurs.

. Under our mandatory obligation to review sufficiency of the evidence in death penalty cases, we conclude that the record in this case contains competent, substantial evidence to support the conviction of first-degree murder, including the admissions that Williams made to three jailhouse witnesses.

. A hasp is "a fastener esp. for a door or lid consisting of a hinged metal strap that fits over a staple and is secured by a pin or padlock.” Merriam Webster's Collegiate Dictionary 570 (11th ed.2005).

. It is unknown whether Dykes had contact with Williams prior to going to work the morning of Tuesday, October 3, or at what time Williams returned Dykes's vehicle.

. Williams had previously lived with Callie at her parents' house. However, Callie’s father had kicked Williams out of the house. Callie continued to live with her parents.

. Photographs of the inside of the trailer introduced- into evidence depict clutter on the floor and on furniture, including toys, a baseball, and collectibles.

. Williams was in jail after being taken into custody by a bail bondsman on October 6 on an unrelated matter after he missed a scheduled court appearance on October 4. No further details of the charge appear in the record.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. Williams makes the following claims: (1) the trial court erred in instructing the jury on and in finding CCP; (2) the trial court erred in instructing the jury on and in finding the avoid arrest aggravator; (3) the trial court erred in instructing the jury on and in finding that the murder was HAC; (4) the trial court erred in instructing the jury on and in finding pecuniary gain aggravator; (5) the trial court erred in failing to find the mitigating factor that Williams’s addiction to crack cocaine substantially impaired his ability to conform his behavior to the requirements of the law at the time of the homicide; (6) the death sentence is inappropriate since no valid aggravating circumstances exist; and (7) the trial court erred in sentencing Williams to death because Florida's capital sentencing proceedings are unconstitutional under the Sixth Amendment pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Because we conclude that competent, substantial evidence supports at least one aggravator, we do not discuss claim 6 (that the death sentence is inappropriate on the basis that no valid aggravating circumstances exist). Because we determine that the death sentence is not proportionate, we do not reach claim 7 (that Williams's death sentence is unconstitutional under Ring v. Arizona).

. See, e.g., Deparvine, 995 So.2d at 381-82 (upholding CCP where defendant "executed a well-thought-out and time-consuming plan to acquire the [victim’s] truck”); Diaz v. State, 860 So.2d 960, 969-70 (Fla.2003) (upholding CCP where defendant "purchased and took possession of a firearm with ammunition several days before the murder,” "outlined his plan in a letter to his brother the previous night,” and "then took his gun and several rounds of replacement ammunition to [the victim’s] house”); Lawrence v. State, 846 So.2d 440, 450 (Fla.2003) (upholding CCP where defendant confessed and wrote "notes describing the planning of the murder”).

. The trial court did not mention this aspect of the medical examiner’s testimony in its sentencing order.

. The dissent cites to Duest v. State, 855 So.2d 33 (Fla.2003), and asserts that, as in Duest, there is no evidence indicating that Williams was substantially impaired at the time of the murder or that his ability to control his behavior was reduced by his use of drugs. Dissenting op. at 211. However, here, unlike in Duest, an expert testified that the defendant's capacity to conform his conduct to the requirements of the law was substantially impaired at the time of the murder. See Stewart v. State, 558 So.2d 416, 420 (Fla.1990) (holding that trial court erred in rejecting the statutory mitigator where a doctor opined that the defendant "was drunk at the time of the shooting and that his control over his behavior was reduced by his alcohol abuse”).

. During the Spencer hearing, Williams testified that he had two previous criminal charges: (1) a charge of grand theft of an automobile when he was eighteen or nineteen and (2) a charge of possession of a firearm by a convicted felon.

. Dr. Larson stated that Williams’s mother may have been abusing alcohol during the pregnancy.