PER CURIAM.
Thomas Ford McCoy, Jr., who was forty-two years old at the time of the crime, pled guilty to the April 2009 first-degree murder of his former colleague, thirty-seven-year-old Curtis Brown. In this proceeding, McCoy appeals the death sentence imposed by the trial court for this murder. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm McCoy’s conviction for first-degree murder and sentence of death.
FACTS AND PROCEDURAL HISTORY
McCoy pled guilty to first-degree murder with a firearm. A penalty-phase proceeding was subsequently conducted before a jury, during which the following *759 evidence was presented regarding the murder of Curtis Brown.
Curtis Brown was a service technician employed by the Coca-Cola Company, operating out of the company’s Valparaiso, Florida, location. This job required Brown to respond to service calls regarding vending, fountain, and ice machines and to repair the machines where they were located. Brown was a very thorough and precise technician who liked to help others, and he had advanced to the service technician position after beginning his employment with the Coca-Cola Company delivering products to vending machines.
On Friday, April 10, 2009, Brown responded to a service call regarding a Coca-Cola machine in a break room at the Northwest Florida State College campus in DeFuniak Springs, Florida, which is in Walton County, in the northwest part of the state. Although another technician, Ray Jackson, typically serviced machines in DeFuniak Springs, Brown would often respond to service calls wherever he was needed and offered to help Jackson by responding to the service call for the Northwest Florida State College machine. Upon responding to the call, Brown was shot six times and killed in the break room where the Coca-Cola machine was located. When emergency personnel arrived, they found Brown lying dead on the floor of the break room. The medical examiner testified that all six wounds could have been fatal and that the time of death from the infliction of the wounds could have been “within seconds or minutes” but was not immediate.
Law enforcement determined that the service call regarding the Northwest Florida State College Coca-Cola machine was placed by Thomas McCoy, a former Coca-Cola employee and colleague of Brown and Jackson until McCoy resigned from the company in June 2006. McCoy had worked for Coca-Cola for about twelve years, beginning in 1994, as part of the five-man service technician team that also included Brown and Jackson. The group liked to play practical jokes on one another, such as turning the windshield wipers on or the radio up in a vehicle that was left unlocked, but there were never any reported or visible signs of animosity between McCoy and the other service technicians.
Despite outward appearances that everything was friendly between the group, however, McCoy apparently had taken offense at certain comments made by Brown and Jackson that he perceived as slights about his lack of a family, and he believed that others were picking on him in situations where his coworkers were simply joking around. In other words, as one of the psychologists who later examined McCoy after the murder explained, “relatively minor things that happen in day-today jobs were taken as pretty bad affronts” by McCoy. Further, although he wanted to get married and have children, McCoy struggled to form relationships with women.
McCoy resigned from Coca-Cola in the summer of 2006, prompted by his dissatisfaction with the company’s policy change regarding when it would begin to pay service technicians for their work. Specifically, Coca-Cola changed its policy to begin paying technicians when they arrived at their first service call, rather than from the time they left their houses in the morning. McCoy spoke to Jackson about this change in policy and decided to complain to their supervisor, Ralph King. However, McCoy later reported to a former coworker, Wendell Kilgore, that he felt as though Jackson did not “have his back” regarding this complaint. Until his resignation from Coca-Cola, McCoy was a good worker who was very meticulous, and *760 King, his supervisor, testified that he never had any problems with McCoy’s work.
Following his resignation from Coca-Cola, McCoy sought medical assistance for psychological issues. In November 2006, McCoy was diagnosed with bipolar disorder by Dr. Mehul Patel, a general practitioner. Dr. Patel prescribed Lamentil, which is an antidepressant, and Seroquel, which is a type of antipsychotic medication that is sometimes used for mood stabilization in people with bipolar disorder. McCoy reported that he tried taking the Seroquel but discontinued it after three or four days due to excessive sedation. In addition, the Seroquel was very expensive, and McCoy stated that he had some trouble affording his medications.
In December 2006, a month after he was diagnosed with bipolar disorder, McCoy was diagnosed with depression by another general practitioner, Dr. David Campbell, and was prescribed Cymbalta, an antidepressant. In February 2007, McCoy told Dr. Campbell that he wanted to change his medication to Zoloft, a different antidepressant. Dr. Campbell complied and also prescribed Xanax, which is an anti-anxiety medication. McCoy reported that he did not understand the instructions for taking the Zoloft and believed it was like a tranquilizer that could be taken only on days when he felt stressed and not on days when he felt better. In actuality, the medication should have been taken regularly in order to build up a certain amount in the body. Aside from his self-reporting, however, it is unknown whether McCoy took the medication properly or not.
McCoy also struggled to find steady employment after resigning from Coca-Cola and continued to struggle to form successful relationships with women. In addition, McCoy faced economic uncertainty, including worrying about losing his home and affording his medications without insurance. A former girlfriend who worked as a nurse at a clinic McCoy attended would, with Dr. Campbell’s permission, sometimes obtain samples of Zoloft for McCoy when they were available.
During the approximately three years after he left Coca-Cola, McCoy developed an intense hatred for his former colleagues Ray Jackson, Ralph King, and Curtis Brown. McCoy felt that Jackson had not checked in on him when he was going through some hard times with his employment and had even laughed at him when McCoy called Jackson after losing a subsequent job. McCoy also regularly contacted King to express interest in reacquiring his job with Coca-Cola, but King informed McCoy on numerous occasions that there were no openings and that he could not create a position for McCoy. Some evidence indicated that McCoy blamed King, Jackson, and Brown for his inability to reacquire his job with Coca-Cola.
In addition, McCoy told Kilgore, his former coworker, that he was upset with Brown because Brown had previously commented in a meeting that McCoy did not have a family. This comment, which hurt McCoy's feelings, was apparently uttered in connection with a benefits meeting Brown and McCoy attended, wherein the subject of health insurance, which was more expensive for families than for a single person, was discussed. McCoy also reported to Kilgore that Jackson liked to put him down about his lack of relationships with women.
In November 2008, McCoy saw James Leddon, another Coca-Cola employee and one of McCoy’s former coworkers, at a local convenience store, and the two conversed. McCoy told Leddon that he was going to kill Jackson and stated that he had already purchased the gun and the materials to build a silencer. McCoy also stated that he was going to shoot Jackson *761 in one knee, then shoot him in the other knee while Jackson was screaming in pain, after which McCoy would walk up to Jackson, laugh in his face, and shoot him between the eyes. Leddon explained that McCoy was visibly upset, as evidenced by the noticeable blood vessels in his face and neck, while making these comments.
According to Jackson, this was the first he knew of a problem between himself and McCoy. Coca-Cola employees reported McCoy’s comments about killing Jackson to the Valparaiso Police Department, and then-Captain Matthew Willingham contacted McCoy to discuss the threat. McCoy indicated that he had been taking Zoloft and that “someone could have taken what he said out of context.” He did state, however, that he did not like Jackson because Jackson never checked in on him when he was going through some hard times after leaving Coca-Cola, and McCoy asked Captain Willingham to pass along a message to Jackson that if McCoy and Jackson ever ran into each other, they should keep their distance.
On the Tuesday before the crime, McCoy called his former coworker, Kil-gore, to chat. McCoy and Kilgore talked frequently, and McCoy, who sounded to Kilgore like he was sad, told Kilgore that he “had something big planned up” and that Kilgore “may see it on CNN.” Kilgore did not know what McCoy meant, but did not think the comment seemed right. After Kilgore got off the phone with McCoy, he reported McCoy’s statements to Ed Hall, then the highest ranking official at the Valparaiso Coca-Cola facility. Upon consulting with a Coca-Cola Company security officer, Hall reported the comment to the Okaloosa County Sheriffs Department, who dispatched a deputy to the facility. The sheriffs department informed Kilgore that requesting a wellness check on McCoy was the only thing that could be done, but suggested that Kilgore not request the wellness check because doing so might agitate McCoy.
McCoy eventually developed the idea of murdering Jackson by placing a fictitious service call to a machine in Jackson’s service region, after McCoy heard another Coca-Cola employee who had been threatened remark about how vulnerable the service technicians were to being lured to a location by a fake service call. A few days prior to the murder, McCoy placed a fake service call regarding a Coca-Cola machine at a Wal-Mart in Jackson’s service area. However, once Jackson arrived, McCoy determined, as he later described it, that there were too many other people around who could get injured, so he decided not to follow through on that plan. He tracked Jackson and followed him out of the Wal-Mart, but eventually lost him.
On April 9, 2009, the day before the murder, McCoy placed another fake service call to report a problem with what he thought was a Coca-Cola machine in Jackson’s area. Unbeknownst to McCoy, however, this machine, located at a local car wash business, had been removed, so Jackson knew this was “a bogus call” and therefore did not need to be immediately addressed. Not realizing this machine was no longer at the location, however, McCoy, who drove a distinctive truck with his business logo on the back window, repeatedly drove through the parking lot at the car wash location to see if Jackson would arrive to address the service call.
Having been unsuccessful at luring Jackson to the car wash business, McCoy placed another fake service call the following day, April 10, regarding the machine in the break room at the Northwest Florida State College campus in DeFuniak Springs. Although this machine was in Jackson’s service area, Brown had previously called Jackson and asked if there *762 was anything Jackson needed help with on that particular day. Jackson informed Brown that he had two service calls he would not be able to attend to right away because he was held up on another project that was taking longer than he expected, so Brown volunteered to handle Jackson’s calls regarding the supposed problems with the Coca-Cola machines at the car wash business and at the Northwest Florida State College campus.
McCoy reported after the crime that he was waiting at the campus for Jackson to arrive and was initially surprised and disappointed to see Brown, rather than Jackson, respond to the fake service call at Northwest Florida State College. However, McCoy stated that, after observing Brown arrive, he went outside and “reprogrammed” himself, making the decision that he hated Brown too, so Brown would be a sufficient victim. McCoy cited the teasing Brown and Jackson had done to him about his relations with women and about not having a family, as well as not being able to get his job back with Coca-Cola, as reasons for hating Jackson, Brown, and King. McCoy stated that although he thought primarily about killing Jackson, he determined that any of the three would have sufficed.
When McCoy entered the break room to carry out his plan to murder Brown, McCoy, who had concealed his weapon in a plastic bag to avoid detection and alarming others, saw that Brown was not in the room but had left his tool bag in front of the Coca-Cola machine unattended. This angered McCoy because he believed that leaving the tool bag unattended was a dereliction of duty on Brown’s part, especially since McCoy prided himself on being a meticulous worker. Brown had also apparently spoken to McCoy previously about not leaving the tool bag unattended and wasting time, leading McCoy to believe that Brown was “a hypocrite.”
When Brown returned to the room, McCoy, who was waiting for him, said that Brown “challenged” him, stating, “Mr. McCoy,” and “puffed up” upon entering the room. McCoy explained after the crime that, if Brown had not blocked him and said, “Mr. McCoy,” but had begged and reminded McCoy of Brown’s wife and children instead, McCoy would have let Brown leave unharmed. However, McCoy stated that Brown “bowed up,” at which point McCoy shot Brown six times, emptying his handgun. McCoy then stepped over Brown’s body and fled the scene.
From the crime scene, McCoy, who was apparently surprised that emergency personnel did not immediately respond while he was still at the campus, drove past the emergency vehicles as they headed toward the crime scene, then got on the highway and headed south toward Tampa. He later reported that, during the time after the murder, if law enforcement had challenged him, he would have killed them because he “was in the mood to kill” and wanted the adventure and the firefight.
McCoy stated that traveling to Tampa was not planned, as he expected law enforcement to respond quickly to the shooting, but he was familiar with Tampa from a prior trip and just needed to get out of town at that point. Along the way, McCoy stopped at a store and bought spray paint so that he could paint over the distinctive markings on the fenders and rear window of his truck in order to avoid detection. McCoy also may have disposed of a telephone and additional bags when he stopped to purchase alcohol.
Upon his arrival in Tampa, McCoy, using his own name, checked in to a Holiday Inn Express near the Busch Gardens amusement park. McCoy considered the Holiday Inn to be a bit of a “splurge” for *763 him, but he decided to “live it up” because he did not expect to be alive much longer. McCoy’s truck was heavily armed with various weapons and ammunition.
McCoy stayed in Tampa avoiding detection for eleven days, until law enforcement received information on April 21 that McCoy was logging onto his computer at the Holiday Inn Express location. When a United States Marshal task force responded to this information, officers spotted McCoy walking through the parking lot on a sidewalk between the wall of the hotel and the hotel pool. The officers determined to apprehend McCoy then, and once they were within ten or twelve yards of McCoy, Deputy U.S. Marshal Christopher Kipp announced their presence, shouting, “Police. Show me your hands. Get on the ground.” McCoy, who was carrying a Taco Bell bag, turned and looked over his left shoulder, shuffled a little bit more, and then turned back around with a gun in his hand.
At that point, Deputy Marshal Kipp fired his gun three times at McCoy, striking him twice. Deputy Marshall Kipp later learned that McCoy had fired his gun during the incident as well. After McCoy fell from the shots, the officers secured McCoy on the ground and placed him under arrest. While on the ground, McCoy asked the officers to shoot him.
From December 2009 to November 2011, following his arrest, McCoy was examined five times by Dr. James D. Larson, a licensed clinical psychologist. Dr. Larson testified during the penalty phase that McCoy stated that he hated Brown, Jackson, and King because “they made fun of him, laughed at him, talked behind his back, didn’t show respect, puffed up and challenged him, made fun of him because he didn’t have a family,” and made other comments that he perceived as “demeaning and derogatory.” Dr. Larson described these comments as “gross misper-ceptions,” explainable as a product of McCoy’s mental illness. Dr. Larson diagnosed McCoy with major depressive disorder, recurrent, with psychotic features. Dr. Larson testified that he could not rule out a “kissing cousin diagnosis” of bipolar disorder. He also explained that McCoy had “self-defeating” personality traits and did not develop a strong self-concept as a result of being raised by an alcoholic, verbally abusive father.
The week before penalty-phase proceedings commenced, McCoy, was examined by Dr. Harry Albert McClaren on behalf of the'State. Although Dr. McClaren later testified for the State, he did so only during the Spencer[1] hearing, during which he explained his conclusions that McCoy was suffering from an episode of major depression at the time the murder occurred and that McCoy would meet the criteria for one or more personality disorders. Dr. McClaren’s specific diagnosis of McCoy at the time of the murder was “[mjajor depression, probable psychosis, and probable alcohol dependence.” Dr. McClaren testified that he would not expect McCoy to have had a high blood alcohol level at the time of the crime, however, based on McCoy’s self-reporting of having consumed about six beers over the course of the day. With respect to the probable psychosis, Dr. McClaren testified that this was entirely dependent on whether McCoy had experienced auditory hallucinations. McCoy told Dr. McClaren that he heard a voice saying, “Do it; go ahead and do it; I wish you’d do it” prior to the murder; however, the first time McCoy reported this or any other auditory hallucinations was on December 30, 2010 — over eighteen months after the murder. Dr. McClaren *764 stated that McCoy’s self-reporting of auditory hallucinations seemed “believable” to him, but that this was a difficult determination to make.
Both Dr. Larson and Dr. McClaren agreed that McCoy qualified for the statutory mental health mitigator that he was under an extreme mental or emotional disturbance at the time of the crime. Dr. Larson also believed that McCoy’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, but Dr. McClaren disagreed, citing McCoy’s goal-oriented behavior and other actions suggesting that he had control of his behavior.
Both experts agreed that McCoy met the criteria for civil commitment at the time of the crime based on McCoy being homicidal and suicidal as a result of his depression. In particular, Dr. Larson testified that this finding was based on McCoy being “a danger to self and a danger to others” as a result of his major depressive disorder. Dr. McClaren testified that if he had been made aware prior to the crime that McCoy was “having these kinds of thoughts ... and he was unreasonable and would not go immediately to seek help,” then civil commitment “is the kind of thing that you’ve got to do.”
At the close of penalty-phase proceedings, the jury recommended the death penalty by a vote of eleven to one. In following this recommendation, the trial court found the following two aggravating circumstances, both of which it assigned great weight: (1) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); and (2) McCoy was previously convicted of a felony involving the use or threat of violence to another person.[2] In addition, the trial court found two statutory mitigating factors, both of which it assigned moderate weight: (1) the capital felony was committed while McCoy was under the influence of an extreme mental or emotional disturbance; and (2) McCoy has no significant history of prior criminal activity. The trial court specifically rejected the statutory mitigating circumstance that McCoy’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. The trial court did, however, find numerous nonstatutory mitigating circumstances.[3]
In conclusion, the trial court determined that the aggravating circumstances outweighed the mitigating circumstances and *765 sentenced McCoy to death. This appeal followed.
ANALYSIS
McCoy raises four claims on appeal to this Court: (1) the trial court erred in finding and assigning great weight to the CCP aggravator; (2) his death sentence is not proportionate; (3) his severe mental illness would render his execution unconstitutional; and (4) this Court should reconsider its precedent regarding the effect of the United States Supreme Court’s decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), on Florida’s capital sentencing scheme. In addition to the claims raised by McCoy, this Court is required to consider whether McCoy’s guilty plea was knowingly, intelligently, and voluntarily entered. We begin by addressing the voluntariness of McCoy’s guilty plea and then proceed to address each of the issues raised by McCoy in turn.
I. Guilty Plea
As an initial matter, although McCoy has not challenged his conviction for first-degree murder in this appeal, nor has he challenged the voluntariness of his guilty plea, this Court has a mandatory obligation to review the basis of McCoy’s conviction for first-degree murder, even when there has been a guilty plea. Gill v. State, 14 So.3d 946, 958-59 (Fla.2009). “Proper review requires this Court to scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily.” Ocha v. State, 826 So.2d 956, 965 (Fla.2002).
In this case, we conclude that a review of the plea colloquy clearly demonstrates that McCoy’s guilty plea was knowingly, intelligently, and voluntarily entered. McCoy was represented by counsel on July 26, 2011, when counsel informed the trial court that McCoy desired to tender a plea of guilty to the charge of first-degree murder, pursuant to a written plea and sentencing agreement McCoy was entering into with the State. Prior to accepting McCoy’s plea, the trial court asked for, and the State provided, a factual basis for the plea, and the trial court found that a sufficient factual basis had been stated and that McCoy and his counsel had stipulated to this factual basis.
McCoy stated during the plea colloquy that he understood that the trial court had no discretion but to impose either a sentence of death or a term of life imprisonment without the possibility of parole for the charge of first-degree murder to which he was pleading guilty. McCoy also affirmatively stated that he understood that the State intended to seek the death penalty; that if his plea was accepted, the case would proceed to a penalty-phase proceeding before a jury; and that the trial court had the ultimate authority and responsibility to impose the sentence.
Based on the plea colloquy, the trial court found that the plea was “freely and voluntarily entered.” The trial court accepted McCoy’s plea of guilty in open court, finding “that he has knowingly and voluntarily entered this plea by way of a plea and sentencing agreement” and that “he has been made aware of all the rights that he is waiving by entering this plea.”
A review of the record thus demonstrates that McCoy was made aware of the consequences of his plea and was apprised of the constitutional rights he was waiving as a result. The trial court specifically and individually explained to McCoy the various constitutional rights he was giving up by entering a plea of guilty, and it is clear that McCoy understood that the State intended to seek the death penalty in this case. The plea colloquy further re- *766 fleets that McCoy affirmatively represented that he was entering the plea of his own volition and had not been coerced or forced into entering the plea.
Accordingly, because McCoy “was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily,” Ocha, 826 So.2d at 965, we conclude that McCoy’s plea was knowingly, intelligently, and voluntarily entered. We therefore affirm his conviction for first-degree murder and now address the four issues raised by McCoy on appeal, all of which relate to the validity of the death sentence imposed.
II. CCP
In this claim, McCoy challenges both the trial court’s finding of CCP and the great weight assigned to this aggravator. “The standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating circumstance is that of competent, substantial evidence.” Guardado v. State, 965 So.2d 108, 115 (Fla.2007).
To establish the CCP aggravator,
the evidence must show: (1) “the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold)”; (2) “the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated)”; (3) “the defendant exhibited heightened premeditation (premeditated)”; and (4) “the defendant had no pretense of moral or legal justification.”
Williams v. State, 37 So.3d 187, 195 (Fla.2010) (quoting Franklin v. State, 965 So.2d 79, 98 (Fla.2007)). “ ‘CCP involves a much higher degree of premeditation’ than is required to prove first-degree murder.” Deparvine v. State, 995 So.2d 351, 381-82 (Fla.2008) (quoting Foster v. State, 778 So.2d 906, 921 (Fla.2000)). “Premeditation can be established by examining the circumstances of the killing and the conduct of the accused.” Williams, 37 So.3d at 195 (quoting Franklin, 965 So.2d at 98). “The CCP aggravator can ‘be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.’ ” Franklin, 965 So.2d at 98 (quoting Swafford v. State, 533 So.2d 270, 277 (Fla.1988)). “Further, ‘the evidence must prove beyond a reasonable doubt that the defendant planned or prearranged to commit murder before the crime began.’ ” Williams, 37 So.3d at 195 (quoting Thompson v. State, 565 So.2d 1311, 1318 (Fla.1990)).
In finding the CCP aggravator to have been proven beyond a reasonable doubt in this case, the trial court stated as follows:
The defendant started his plan to kill Ray Jackson or Curtis Brown before April 10, 2009. The defendant became enraged at Ray Jackson for his perception of Ray Jackson’s comments concerning the defendant’s lack of a girlfriend. The defendant began to form a hatred of Curtis Brown from a conversation about insurance premiums for Coca-Cola Company employees. Witness testimony indicated that the defendant was easily offended, that he took events or comments out of context, and that no one could joke with him. The witnesses also described some of the events and comments that the defendant had overreacted to in the past. The defendant blamed Ray Jackson and Curtis Brown for not being able to be rehired at the Coca-Cola Company. He also blamed Ralph King for not being re-employed.
In a conversation a few days before the murder, the defendant first learned *767 of how to lure a Coca-Cola Company technician, after he heard another Coca-Cola Company employee make a comment regarding such a plan. After considering the comment for a while, the defendant made a false service call for Wal-Mart in DeFuniak Springs, Florida because he knew it was in Ray Jackson’s area. However, the defendant decided not to kill Ray Jackson at the Wal-Mart location because too many innocents were present. The defendant followed Ray Jackson with the intent to kill him in a safer area, but he eventually abandoned that attempt.
The defendant’s comments to third parties indicated that he planned or intended to commit the murder. The defendant told Wendell Kilgore that “you might see me on CNN.” The defendant also told James Leddon that he intended to kill Ray Jackson. The defendant even told James Leddon that he had already purchased the gun and materials needed to build a silencer.
On April 9, 2009, the defendant placed a false service call concerning a Coke machine at Earley’s Car Care and Car Wash that was previously located in Ray Jackson’s assigned region, but no one responded to that call. The defendant made another false service call regarding a Coke machine at Northwest Florida State College (“NWFSC” or “campus”). The defendant made this call on the morning of April 10, 2009. The defendant was cool and calm during this call. After making this call, the defendant drove to the campus and prepared to commit the murder. The defendant brought his handgun and ammunition with him to the campus. After he arrived on the campus, the defendant placed his pistol inside a bag and proceeded to wait for his intended victim to arrive. The defendant’s reason for carrying the murder weapon in the bag was to prevent anyone else on the campus from seeing the firearm. The defendant told one of the mental health experts who testified that he did not want to scare anyone. The defendant realized Curtis Brown responded to the campus instead of Ray Jackson. The defendant stated that instead of leaving the campus, he decided that Curtis Brown would be a sufficient victim because the defendant also hated him. The defendant told Dr. James Larson that he hated Curtis Brown, and he told Dr. Harry McClaren that he thought about killing Ray Jackson but that any of the three would do, meaning Curtis Brown and Ralph King.
Curtis Brown entered the room where the Coke machine was located, placed his machine repair tools in the room, and proceeded to leave the room. During this short absence, the defendant entered the room and waited for Curtis Brown to return. Once Curtis Brown returned to the room, the defendant shot him with every bullet in his handgun without any provocation or justification on the part of Curtis Brown. After Curtis Brown fell to the ground, the defendant stepped over him, left the room, and drove away from the area. Curtis Brown received six gunshot wounds and died from his wounds.
The facts demonstrate a lack of any moral or legal justification for killing Curtis Brown. Multiple witnesses testified during the penalty-phase proceeding that the defendant hated Ray Jackson and Curtis Brown because of events that occurred years earlier. The defendant also blamed them and Ralph King for his inability to regain employment at the Coca-Cola Company. Therefore, the Court finds that the cold, calculated, and premeditated aggravating circumstance has been proven beyond a rea *768 sonable doubt. Accordingly, the Court gives it great weight.
(Footnotes omitted.)
McCoy argues that there is not competent, substantial evidence to support the trial court’s finding of CCP in this case. Specifically, although he does not dispute that the murder was clearly “calculated,” “premeditated,” and lacking in moral or legal justification — thereby satisfying three of the four required elements for CCP — McCoy argues that the murder was not “cold” because his actions, though planned, were the culmination of a long-festering, irrational rage that exploded in the kind of tragic, emotional frenzy that precludes a finding of CCP. Having fully examined the record in this case and reviewed our past precedent, we disagree with McCoy’s contention that it was error for the trial court to find CCP in this case.
This Court has previously explained that a “defendant can be emotionally and mentally disturbed or suffer from a mental illness but still have the ability to experience cool and calm reflection, make a careful plan or prearranged design to commit murder, and exhibit heightened premeditation.” Evans v. State, 800 So.2d 182, 193 (Fla.2001). In Evans, we rejected a challenge to CCP based on an argument similar to the one presented by McCoy in this case that the defendant’s mental illness, as evidenced by the trial court’s finding and weighing of the mitigating factor that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, made it impossible for the defendant to formulate the necessary coldness and careful plan for CCP to apply. Id. at 192-98.
This Court held in Evans that “[t]he fact that the trial court recognized and gave substantial weight to the mental mitigator does not necessarily mean that the murder was an act prompted by emotional frenzy, panic, or a fit of rage,” which would preclude a finding of the “cold” element of CCP. Id. at 193. Although this Court determined that the defendant in Evans may have been “emotionally charged,” the Court explained in that case that the defendant’s actions did not “suggest a frenzied, spur-of-the-moment attack” of the kind that would negate CCP. Id.; see also Owen v. State, 862 So.2d 687, 701-02 (Fla.2003) (relying on Evans to reject the defendant’s argument that his mental illness negated the CCP aggravator and stating that the evidence clearly demonstrated that the defendant went to the crime scene “with a definite plan” to commit murder).
This Court’s precedent therefore establishes that, contrary to McCoy’s argument, his irrational behavior as a result of his mental illness does not in and of itself preclude a finding of the requisite “coldness” for application of CCP. The facts of this case demonstrate without a doubt that McCoy had a calculated plan to commit this murder and that his actions were not the result of provocation or a classic heat of passion situation.
Nevertheless, McCoy contends that this murder was prompted by emotional frenzy, panic, or a fit of rage — however irrational that rage may have been — and therefore, as this Court stated in Santos v. State, 591 So.2d 160, 163 (Fla.1991), this murder simply cannot be considered “cold” because this was a crime of “irrational, heated passion” prompted by a fit of rage, rather than a killing that was the product of cool and calm reflection. We conclude that this argument is without merit.
Although the “cold” element of CCP is a separate prong of the aggravator that is subject to its own analysis, it is not as readily distinguishable as McCoy suggests from the prearranged plan and heightened premeditation necessary to satisfy the oth *769 er elements. This is because the “cold” prong requires “cool and calm reflection,” which can often be indicated by the presence of a plan or design to commit the murder. For example, in Kaczmar v. State, 104 So.3d 990, 1006-07 (Fla.2012), this Court agreed with the defendant’s argument that the murder was not “cold” because he was “not planning to kill” the victim but instead “killed her in a frenzied rage.” In Russ v. State, 73 So.3d 178, 193 (Fla.2011), we rejected a challenge to the “cold” element of CCP, but explained as the basis for doing so that “the murder was premeditated” and described how the defendant “waited inside of [the victim’s] home for at least eight or nine hours, during which he had time to calmly reflect prior to” the murder. Further, in Hall v. State, 107 So.3d 262, 278 (Fla.2012), cert. denied, _ U.S. _, 134 S.Ct. 203, 187 L.Ed.2d 137 (2013), this Court held that the trial court’s finding that the murder was “cold” was not supported by competent, substantial evidence because “[a]l-though there is extensive evidence regarding [the defendant’s] actions after the murder, those actions do not prove that he planned [the victim’s] murder beforehand.”
Indeed, even in Santos, 591 So.2d at 163, on which McCoy relies, this Court based its decision to strike CCP on the fact that the evidence reasonably demonstrated that the defendant’s acts “constituted a crime of heated passion.” The Court compared the facts in Santos to those of Douglas v. State, 575 So.2d 165 (Fla.1991), where this Court held that the “classic crime of heated passion” in that case was not “cold” because there “was no deliberate plan formed through calm and cool reflection, only mad acts prompted by wild emotion.” Santos, 591 So.2d at 163 (citation omitted).
McCoy also relies on Cannady v. State, 620 So.2d 165, 170 (Fla.1993), for the proposition that a murder can be “calculated” without being “cold.” In Cannady, this Court, referencing Santos, rejected the finding of CCP because the murder “was not ‘cold,’ although it may have been ‘calculated.’” Id. The Court stated that the defendant’s emotional distress over the alleged rape of his wife by one of the victims in Cannady “mounted over a two-month period” and “reached a pinnacle” when the defendant killed his wife and then “set out to kill the apparent cause of her suffering.” Id.
While the Court in Cannady concluded that the defendant’s acts, though perhaps calculated, were “not the result of ‘cold’ deliberation,” the Court was clear that, on the facts of that case, “[t]here was no deliberate plan formed through calm and cool reflection, only mad acts prompted by wild emotion.” Id. (quoting Santos, 591 So.2d at 163). Likewise, in both Maulden v. State, 617 So.2d 298, 302-03 (Fla.1993), and Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992), which McCoy also cites, the Court relied on Santos to hold that the murders were not the product of a deliberate plan formed through cool and calm reflection but were instead “mad acts prompted by wild emotion.” Santos, 591 So.2d at 163.
By contrast and despite McCoy’s arguments to the contrary, there is no evidence in this case that McCoy acted out of frenzy, panic, or a fit of rage. Instead, the record clearly demonstrates that McCoy had a deliberate plan to commit this murder. As the trial court explained, McCoy placed a fake service call regarding the Coca-Cola vending machine at the Northwest Florida State College campus, where he drove, in order to lure the victim to the crime scene. He concealed the murder weapon, which he brought with him to the scene, in order to avoid detection by others and to avoid alarming bystanders, and he waited for his victim to arrive.
*770 We recognize, as did the trial court, that McCoy’s original prearranged plan was to lure Ray Jackson to the campus in order to shoot and kill him. However, the record is clear that when McCoy realized that Curtis Brown, rather than Jackson, had responded to the call, McCoy, who stated that he hated Brown as well as Jackson, decided that Brown would be a sufficient victim. McCoy’s desire to kill Brown was further reinforced when he noticed Brown’s tool bag left unattended, which made McCoy angry because he considered this to be a dereliction of duty on Brown’s part. In addition, the record reveals that McCoy had previously announced his plan to commit this murder and stated to a former coworker at Coca-Cola, James Leddon, that he had already purchased the gun and materials to build a silencer. McCoy also made two prior attempts — one the day before the murder — to carry out his plan.
In other words, although McCoy’s reasons for committing the murder may have been irrational and based on mispercep-tions that developed into rage as a result of his mental instability, the murder itself in this case was calmly reflected upon and carried out as a matter of course, with advance procurement of the weapon and McCoy lying in wait for his victim — the hallmarks of a case in which CCP is properly found. See, e.g., Buzia v. State, 926 So.2d 1203, 1215 (Fla.2006) (“[T]he facts supporting [the CCP aggravator] must focus on the manner in which the crime was executed, e.g., advance procurement of weapon, lack of provocation, killing carried out as a matter of course.... ” (quoting Looney v. State, 803 So.2d 656, 678 (Fla.2001))); see also Davis v. State, 2 So.3d 952, 962 (Fla.2008) (concluding that the evidence refuted the defendant’s argument “that the crime was impulsive and the product of an emotional disturbance, rather than calculated and demonstrative of heightened premeditation,” distinguishing Santos, and stating that “there was no evidence that [the defendant’s] ability to control his conduct and understand his actions was impaired due to intoxication or severe mental illness, such as schizophrenia or psychosis”).
Further, after Brown rather than Jackson responded to the fake service call, McCoy had ample time to reflect upon his decision and to abandon his plan to commit the murder. Instead, McCoy deliberated and made a conscious decision to carry out the murder against another victim, against whom he also carried a grudge. In particular, McCoy stated that, although he was initially disappointed to see Brown instead of Jackson, he went outside and “reprogrammed” himself, specifically deciding that Brown would be a sufficient victim prior to reentering the break room to carry out his plan. Accordingly, because this case is unlike those cases in which the murder was committed in a “frenzied, spur-of-the-moment attack” that would negate the “cold” element of CCP, Evans, 800 So.2d at 193, we conclude that the trial court did not err in finding this aggravator.
We also conclude that the trial court did not err in assigning CCP great weight. This Court has explained that “[t]he weight to be given aggravating factors is within the discretion of the trial court and is subject to the abuse of discretion standard.” Carter v. State, 980 So.2d 473, 483 (Fla.2008) (citing Sexton v. State, 775 So.2d 923, 934 (Fla.2000)).
McCoy argues that the trial court should have assigned less weight to the CCP ag-gravator because his mental health problems and the emotional instability he demonstrated in committing this crime reduce the significance of CCP. In weighing this aggravator, however, the trial court specif *771 ically detailed the facts supporting CCP and considered the circumstances surrounding McCoy’s state of mind at the time of the murder. In addition, the trial court explained the extensive planning undertaken by McCoy prior to the murder, including McCoy’s two prior unsuccessful attempts to carry out his plan to kill, and noted that after McCoy made the fake service call, he “placed his pistol inside a bag and proceeded to wait for his intended victim to arrive.” We therefore conclude that there was no abuse of discretion in assigning great weight to the CCP aggra-vator. For these reasons, we reject McCoy’s challenge to CCP and deny relief on this claim.
III. Proportionality
In this claim, McCoy contends that death is a disproportionate punishment in this case. In particular, McCoy argues that the existence of substantial mental illness makes the aggravating circumstances qualitatively less significant and the mitigation qualitatively weightier than other cases where the death penalty has been imposed. Although the finding of statutory mitigation is certainly an important consideration, based upon a complete review of the record and an examination of the totality of the circumstances, we reject McCoy’s proportionality argument after concluding that McCoy’s case is distinguishable from the cases on which he relies.
“The death penalty is ‘reserved only for those eases where the most aggravating and least mitigating circumstances exist.’ ” Silvia v. State, 60 So.3d 959, 973 (Fla.2011) (quoting Terry v. State, 668 So.2d 954, 965 (Fla.1996)). “Therefore, in deciding whether death is a proportionate penalty, the Court makes a ‘comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.’ ” Id. (quoting Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003)). Accordingly, the Court “consider[s] the totality of the circumstances of the case and compare[s] the case to other capital cases.” Offord v. State, 959 So.2d 187, 191 (Fla.2007). “This analysis ‘is not a comparison between the number of aggravating and mitigating circumstances.’ ” Silvia, 60 So.3d at 973 (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). “Rather, this entails ‘a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.’ ” Id. (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)). “In reviewing the sentence for proportionality, this Court will accept the jury’s recommendation and the weight assigned by the trial judge to the aggravating and mitigating factors.” Id.
In this case, the jury recommended death by a vote of eleven to one. The trial court found the following two aggravating circumstances, both of which it assigned great weight: (1) CCP; and (2) a prior violent felony. The trial court’s finding of the prior violent felony aggravator was based on McCoy’s conviction for aggravated assault on a law enforcement officer after he shot at the officers who came to arrest him in Tampa for the murder of Curtis Brown. While McCoy has challenged the finding of and the weight assigned to CCP, he has not specifically challenged the great weight assigned by the trial court to the prior violent felony ag-gravator, nor has he challenged the trial court’s factual findings on this issue. McCoy suggests, however, that this aggra-vator should be given less significance in this Court’s proportionality review because McCoy allegedly did not want to hurt anyone in the Tampa shootout. Yet, this as *772 sertion is directly refuted by the trial court’s factual findings.
In assigning great weight to the prior violent felony aggravating circumstance, the trial court rejected McCoy’s assertion that he did not intend to harm the officers but was in actuality attempting “suicide by cop.” The trial court stated that “the evidence of the bullet’s path contradicts this claim” and instead “supports the fact that the defendant intended to harm the responding officers and to have the responding officers harm him.”
Specifically, McCoy reported to both Dr. Larson and Dr. McClaren that he shot high in the Tampa altercation with the intent of forcing the police to kill him. However, the trial court found, based on the testimony presented during the penalty phase, that the trajectory of McCoy’s bullet demonstrated that the bullet went through the rail of the hotel pool, passed across the pool area, and struck the rail on the other side in a diagonal across the pool. There is competent, substantial evidence to support the trial court’s determination that this trajectory indicates that McCoy’s gun was not aimed high and that McCoy did not shoot into the air as he later claimed. Instead, as found by the trial court, for the bullet to travel this path, “it had to pass by the responding officers’ bodies.” Moreover, we note that the prior violent felony in this case is qualitatively unlike the prior violent felony in Scott v. State, 66 So.3d 923, 936 (Fla.2011), where this Court determined that the contemporaneous conviction for aggravated battery involving “a limited threat of violence and no permanent injury” militated against the weight that a prior violent felony would normally carry.
In addition to the two statutory aggravating circumstances, the trial court in this case found two statutory mitigating factors, both of which it assigned moderate weight: (1) the capital felony was committed while McCoy was under the influence of an extreme mental or emotional disturbance; and (2) McCoy has no significant history of prior criminal activity. The trial court also found numerous nonstatutory mitigating circumstances. However, the trial court rejected as not proven the statutory mitigating circumstance that McCoy’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
Although Dr. Larson, the defense expert, testified that he believed McCoy would qualify for this mitigator, Dr. McClaren, the State’s expert, opined that he was “sure” that McCoy “was able to know that killing that man was criminal.” Dr. McClaren also cited other actions taken by McCoy, including not killing Ray Jackson during the Wal-Mart incident and exhibiting goal-oriented behavior, as proof that McCoy’s conduct was not substantially impaired because he was able to exercise control. The trial court determined that McCoy’s actions during and after the crime supported Dr. McClaren’s findings regarding this statutory mitigating circumstance and therefore rejected it. As previously noted, however, the trial court did find that the murder was committed while McCoy was under the influence of an extreme mental or emotional disturbance — a mitigator both mental health experts agreed upon.
In challenging the proportionality of his death sentence, McCoy primarily relies on Green v. State, 975 So.2d 1081, 1083 (Fla.2008), where this Court vacated a defendant’s death sentence on proportionality grounds based on the existence of “substantial mental health mitigation.” Specifically, in Green, the trial court “found all three statutory mitigating factors related to mental health: that Green was under *773 the influence of extreme mental and emotional disturbance; that his capacity to conform to the requirements of the law was substantially impaired; and that he acted under extreme duress or under the substantial domination of another person.” Id. The Court explained in Green that the defendant had a history of schizophrenic disorders, shot a bull grazing in a nearby pasture prior to committing the murder, and was declared incompetent to stand trial until after he was committed for over a year to receive treatment from a mental health facility. Id. at 1083-84. The Court then recounted the testimony presented at trial concerning Green’s mental health problems, which included angry, violent, and unusual behavior; manifestations of hallucinations that were observed by others; involuntary psychiatric commitment four months prior to the murder; strange and nonsensical drawings; and other plainly delusional behavior. Id. at 1084-86.
On direct appeal of Green’s death sentence, this Court struck the avoid arrest aggravator found by the trial court, leaving only the single aggravating circumstance of a contemporaneous attempted murder conviction. Id. at 1088. In light of this single aggravator and the “substantial mitigation” presented and found by the trial court, this Court concluded that the murder in Green did not warrant a death sentence. Id. The Court explained, however, that even if it had not stricken the avoid arrest aggravator, it “would reach the same conclusion based on the substantial and uncontroverted evidence of the defendant’s mental illness.” Id.
Although McCoy contends that an analysis similar to the one employed by this Court in Green is appropriate in this case, we disagree for several reasons. First, the aggravation in this case is significantly weightier than the aggravation in Green. After the Court struck the avoid arrest aggravator, Green became a single-aggra-vator case, and, as the Court explained, “death is not indicated in a single-aggravator case where there is substantial mitigation.” Id. (quoting Almeida v. State, 748 So.2d 922, 933 (Fla.1999)). While Green and this case both involve a serious prior violent felony aggravator, this case also involves a second aggravator — CCP—that the trial court assigned great weight.
Second, even assuming that the aggravation in this case and in Green are substantially and qualitatively similar, the testimony regarding the mental illness in Green reflects more substantial mental health mitigation. Specifically, this Court explained as follows in Green:
Green has a history of intermittently treated mental illness dating back to at least age 13. The trial court accurately described Green’s life after age 13 as “a psychological, emotional, and antisocial free fall into an abyss of aberrational, delusional and psychotic behavior.” Green was diagnosed as suffering from depression, impulse control disorder, and schizoaffective disorder. He refused to treat his illness and instead resorted to marijuana and ecstasy to quiet the voices in his head and cope with his depression. Shortly before committing these crimes, Green was involuntarily committed and placed in a crisis stabilization unit. Between the time he left that unit and the shootings, his mental health significantly deteriorated. In fact, all three mental health experts agreed, and the trial court found, that during the shootings “he was fully immersed in a drowning pool of mental illness.” Therefore, we find that without question Green[’]s mental health significantly contributed to the murder.
Id. at 1089.
We conclude that a review of the mental health testimony presented in this case *774 demonstrates that McCoy’s mental illness, as it relates to this crime, is less compelling than that of the defendant in Green. Both Dr. Larson and Dr. McClaren agreed that McCoy was clinically depressed and had been since at least late 2006, when McCoy first visited Drs. Patel and Campbell. Although both psychologists testified that McCoy’s depression had psychotic features, this finding was based on McCoy’s inconsistent self-reporting, beginning over a year and a half after the crime, of auditory hallucinations.
Both experts agreed that McCoy was under the influence of an extreme mental or emotional disturbance when he murdered Curtis Brown. The experts disagreed, however, about whether McCoy’s ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, and the trial court ultimately concluded that it was not. Further, with respect to the experts’ conclusion that McCoy met the criteria for civil commitment — a factor cited extensively by McCoy — the experts based this conclusion on the fact that McCoy had expressed to others his intention to kill prior to the incident and had also expressed suicidal ideations.
The experts’ testimony that McCoy met the criteria for civil commitment based on being a danger to others is qualitatively different than the testimony in Green regarding the defendant’s involuntary commitment in that case. In Green, the defendant had in fact been involuntarily committed based on his history of “aberrational, delusional and psychotic behavior.” Id. By contrast, although McCoy points to the testimony from Drs. Larson and McClaren that he should have been civilly committed as indicative of the severity of his mental illness, a review of the testimony on this issue demonstrates that the reason for that conclusion was because McCoy had expressed to others his desire to kill before the incident, which hardly mitigates against the death penalty.
Based on a thorough review of the testimony presented in this case, we conclude that although McCoy is mentally ill, his diagnosis, which includes clinical depression that was exacerbated by difficult life situations, does not rise to the level of the defendant in Green for purposes of a qualitative proportionality review. While the expert testimony supports the conclusion that McCoy’s mental health contributed to the murder in this case, it did so through McCoy mispereeiving situations and demonstrating self-loathing and self-defeating personality traits, rather than as a product of McCoy being “fully immersed in a drowning pool of mental illness.” Id.
Finally, the trial court also found more statutory mitigation in Green than in this case. In Green, the trial court found all three statutory mental health mitigators, id. at 1088, whereas the trial court in this case found only one statutory mental health mitigator — extreme mental or emotional disturbance — and rejected another. Accordingly, for these reasons, we conclude that Green does not compel us to reduce the sentence in this case to life based on proportionality.
In addition, a review of other cases establishes that death is a proportionate punishment in this case. For example, in Lawrence v. State, 846 So.2d 440, 455 (Fla.2003), this Court upheld a death sentence despite the presence of five statutory mitigating circumstances, including considerable weight assigned to two statutory mental health mitigators. Further, Lawrence included the same two aggravating circumstances as this case — CCP and prior violent felony — both of which the trial court in Lawrence, like the trial court in this case, assigned great weight. Id.; see also *775 Diaz v. State, 860 So.2d 960, 964 n. 8 & n. 4 (Fla.2003) (upholding death sentence in case where the same two aggravators (CCP and prior violent felony), both assigned great weight, were upheld on appeal, and the trial court found five statutory mitigating circumstances, including the same two statutory mitigating circumstances as in this case (no significant history of prior criminal activity and under the influence of extreme mental or emotional disturbance), as well as the age mitigator and the additional mental health mitigator rejected by the trial court in this case). For all these reasons, we conclude that McCoy’s death sentence is proportionate.
IV. Mental Illness as a Bar to Execution
In his next claim, McCoy argues that the execution of someone like himself, who is so severely mentally ill that he lacks the requisite moral culpability to justify the imposition of the death penalty, constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution and article I, section 17, of the Florida Constitution. In other words, McCoy contends that his mental illness places him within the class of persons, similar to those under the age of eighteen at the time of the crime and those with mental retardation, who are categorically excluded from being eligible for the death penalty, based on the principles set forth in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), which held that the death penalty is unconstitutional for those defendants who were younger than eighteen years old at the time of the crime, and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that the death penalty is unconstitutional for mentally retarded defendants.
This Court has consistently rejected this claim. See Carroll v. State, 114 So.3d 883, 886-87 (Fla.), cert. denied, _ U.S. _, 133 S.Ct. 2762, 186 L.Ed.2d 213 (2013) (rejecting claim that mental illness bars execution and citing numerous prior cases); Simmons v. State, 105 So.3d 475, 510-11 (Fla.2012) (rejecting claim that persons with mental illness must be treated similarly to those with mental retardation due to reduced culpability); Barwick v. State, 88 So.3d 85, 106 (Fla.2011) (rejecting “the argument that Roper extends beyond the Supreme Court’s pronouncement that the execution of an individual who was younger than eighteen at the time of the murder violates the eighth amendment”); Johnston v. State, 27 So.3d 11, 26 (Fla.2010) (rejecting claim that mentally ill persons are similar to and should be treated the same as juvenile murderers who are exempt from execution); Lawrence v. State, 969 So.2d 294, 300 n. 9 (Fla.2007) (rejecting the claim that “the Equal Protection Clause requires this Court to extend Atkins to the mentally ill”); Connor v. State, 979 So.2d 852, 867 (Fla.2007) (“To the extent that Connor is arguing that he cannot be executed because of mental conditions that are not insanity or mental retardation, the issue has been resolved adversely to his position.”).
Because McCoy has not presented any compelling reason for this Court to reconsider its established precedent on this issue, we deny this claim.
V. Ring Claim
In his final claim, McCoy argues that this Court has wrongly decided the impact of the United States Supreme Court’s decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), on Florida’s capital sentencing scheme. However, this case involves the prior violent felony aggravator, which means, as this Court has consistently held, that Ring is not implicated. See, e.g., Johnson v. State, 104 So.3d 1010, 1028 (Fla.2012) (stating *776 that this Court has repeatedly rejected Ring claims where the prior violent felony aggravator has been found); Hodges v. State, 55 So.3d 515, 540 (Fla.2010) (“This Court has repeatedly held that Ring does not apply to cases where the prior violent felony, the prior capital felony, or the under-sentence-of-imprisonment aggravating factor is applicable.”); Frances v. State, 970 So.2d 806, 822 (Fla.2007) (“This Court has repeatedly relied on the presence of the prior violent felony aggravating circumstance in denying Ring claims.”); Davis v. State, 875 So.2d 359, 374 (Fla.2003) (stating with respect to Ring claims that this Court has “denied relief in direct appeals where there has been a prior violent felony aggravator”).
Accordingly, because one of the aggravating circumstances in this case is a prior violent felony conviction, we deny relief on McCoy’s Ring claim.
CONCLUSION
After a thorough review of all the issues raised by McCoy, and after our own independent review of the voluntariness of the guilty plea, we affirm McCoy’s conviction for first-degree murder and the sentence of death imposed.
It is so ordered.
PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., concurs in result.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The prior violent felony aggravator was based on McCoy’s conviction for aggravated assault on a law enforcement officer as a result of the Tampa shootout. McCoy was convicted of that crime prior to his trial in this case.

. The nonstatutory mitigating circumstances were the following: (1) McCoy had a long-term struggle with depression (no individual weight assigned but considered and weighed in evaluating the statutory mitigating circumstance of extreme mental or emotional disturbance); (2) McCoy has a family history of depression and mental illness (moderate weight); (3) McCoy has a family history of alcoholism (little weight); (4) McCoy was raised in a dysfunctional family that suffered from mental illness, psychological abuse, and emotional abuse (little weight); (5) despite his dysfunctional upbringing, McCoy was able to achieve a modicum of success for a period of time in his adult life (little weight); (6) McCoy served in several branches of the military (little weight); (7) McCoy adjusts well to a structured environment (little weight); (8) McCoy is at low risk to reoffend or to create a threat to anyone in the future (little weight); (9) McCoy is remorseful and ashamed of his conduct and has accepted responsibility for his crime (moderate weight); and (10) McCoy has many positive characteristics (moderate weight).